

FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

FEB 23 2026

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

|  |  |
|---|---|
| BENJAMIN ODUM SOUTHER,<br>Plaintiff Pro Se, | CIVIL ACTION NO.<br>2:25-CV-150-SCJ |
| v. | JURY TRIAL DEMANDED |
| KASHYAP P. PATEL<br>in his official capacity as<br>Director of the Federal Bureau of<br>Investigation<br>935 Pennsylvania Avenue, NW<br>Washington, D.C. 20535; |  |
| FEDERAL BUREAU OF<br>INVESTIGATION<br>935 Pennsylvania Avenue, NW<br>Washington, D.C. 20535; |  |
| PAMELA J. BONDI<br>in her official capacity as Attorney<br>General of the United States<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530; |  |
| U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530; |  |
| Defendants. |  |

**AMENDED COMPLAINT**

**FIRST AMENDED CIVIL COMPLAINT FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF REQUESTED AND DEMAND FOR A JURY TRIAL**

Plaintiff Benjamin O. Souther, hereby brings this first amended complaint against Defendants, the Federal Bureau of Investigation (FBI), Kashyap Patel, acting in an official capacity as the Director of the FBI, and Pamela Bondi, acting in her official capacity as the Attorney General of the United States, and the United States Department of Justice (DOJ). In support thereof, upon personal knowledge as well as information and belief, Plaintiff alleges the following:

**NATURE OF THE ACTION**

1. The First Amendment to the United States Constitution forbids government officials from dismissing public employees for partisan reasons. Political patronage—where "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party"—is unconstitutional because "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Elrod v. Burns*, 427 U.S. 347, 357-59 (1976). This civil rights action arises under the First

2

and Fifth Amendments to the United States Constitution, seeking declaratory and injunctive relief against what can only be described as the FBI's deliberate, politically driven destruction of a career — the unconstitutional termination of a Special Agent in direct retaliation for answering a supervisor's question honestly.

2. The facts are unambiguous. An FBI supervisor solicited Plaintiff's professional judgment regarding the Bureau's operational response to a January 6th search warrant execution — a law enforcement action in which Plaintiff personally participated. Compelled by duty and by the direct order implicit in any supervisory inquiry, Plaintiff answered honestly: deploying two full SWAT teams to execute a search warrant was operationally disproportionate, a misuse of FBI resources, and a deliberate diversion of experienced agents — including Plaintiff — away from other critical violations, such as violent crimes against children investigations. It was a truthful answer to a direct question. Nothing more. And it was an answer that did not conform to the political orthodoxy FBI leadership was actively working to enforce. The FBI's response was not discipline. It was retaliation — swift, targeted, and political. The Bureau did not punish Plaintiff for misconduct. It punished

3

him for answering honestly when a supervisor asked his opinion — for giving a truthful assessment that did not conform to the political orthodoxy the Bureau's leadership was actively working to impose. His termination was not the product of any legitimate law enforcement judgment. It was an instrument of enforced conformity — a calculated message to every FBI agent that truthful answers to supervisory inquiries were only acceptable if those answers aligned with the ideological imperatives of the Biden Administration and Deputy Director Paul Abbate. Loyalty to the party in power, it turned out, mattered more than loyalty to the Constitution, to the mission, or to the truth.   That is precisely what the First and Fifth Amendments were designed to prevent.

3. Defendants, motivated by political retaliation, sought to justify the termination using shifting pretextual grounds.

4. Plaintiff's experience is not an isolated act of institutional misconduct. It is part of a documented, systemic pattern of political retaliation within the FBI that has drawn the attention of Congress and the Department of Justice's own Inspector General.

5. Former FBI employees have testified before Congress that the Bureau was deliberately weaponized against agents who questioned the official

narrative surrounding the January 6th events — that employees who failed to align with the prevailing political orthodoxy within the agency were identified, targeted, and purged. That testimony is not abstract. It describes precisely what happened to Plaintiff: a career agent who answered a supervisor's direct question honestly, whose answer did not conform to the ideological posture FBI leadership was actively enforcing, and who was terminated on manufactured grounds shortly after giving it.

6. The Department of Justice Office of Inspector General has reached similar conclusions. In a Management Advisory Memorandum issued January 14, 2026, the OIG identified serious concerns regarding the FBI's internal interview practices in security investigations — specifically, that questions posed to employees during those investigations may have intruded upon constitutionally protected activities. That finding is significant. It is an acknowledgment by the government's own watchdog that the investigative apparatus used against agents like Plaintiff was not operating within constitutional bounds — that the process itself was infected by the same political motivations that drove the underlying targeting.

7. These are not background facts. They are corroborating evidence of the institutional environment in which Plaintiff's termination occurred — an environment in which political conformity was demanded, dissent was punished, and the Bureau's internal disciplinary machinery was deployed not to enforce legitimate conduct standards but to eliminate agents whose perceived beliefs made them inconvenient. The OIG's ongoing review of the FBI's treatment of employees connected to January 6-related cases confirms that Plaintiff's claims are neither novel nor implausible. They are, by the government's own account, an admission and part of a pattern that demands accountability *(see Exhibit A – DOJ OIG Report)*.

8. To protect Plaintiffs' constitutional rights, the rights of remaining FBI employees, and the vital interests served by the FBI, Plaintiff requests this Court review and grant relief on the grounds that Defendants' actions violated his First Amendment rights to free speech and association, including non-association, and Fifth Amendment right to due process were taken without any constitutional authority and are a legal nullity. Plaintiff seeks equitable relief in vindication of his constitutional rights; declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and mandamus relief under 28 U.S.C. § 1361.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because plaintiff's cause of action arise under the Constitution and laws of the United States.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and or actions directed by FBI employees under the authority of Defendants were undertaken in Atlanta, Georgia.

## PARTIES

11. Plaintiff, Benjamin (Ben) Souther, is a citizen of the United States, who resides in Gainesville, GA. He worked for the Federal Bureau of Investigation until his unlawful discharge on October 27, 2021.

12. Defendant Kashyap Patel is sued in his official capacity as the current Director of the FBI.

13. Defendant FBI is a subordinate component of the Department of Justice (DOJ) pursuant to 28 C.F.R. § 0.1.

14. Defendant Pamela J. Bondi is sued in her official capacity as the current Attorney General of the United States and official in charge of the DOJ.

7

15. Defendant DOJ is an agency of the United States subject to the jurisdiction of this Court. DOJ controls its components, including the FBI.

## EXHAUSTION

16. In 2022, Plaintiff appealed his termination to the Merit Systems Protection Board ("MSPB"). The MSPB dismissed the appeal for lack of jurisdiction. The plaintiff filed a complaint with the DOJ Office of Inspector General. On May 8, 2022, DOJ-OIG declined to investigate (*see Exhibit B - OIG decline)*. No further administrative review process exists. Plaintiff has no remaining administrative forum in which to adjudicate his constitutional claims. Plaintiff has continually reached out to the FBI and DOJ for an administrative forum to clear his name but to no avail.

17. Plaintiff does not assert a property interest in continued federal employment and does not seek review of a routine personnel action under the Civil Service Reform Act ("CSRA"). Instead, Plaintiff brings two independent constitutional claims: (1) retaliation for protected speech in violation of the First Amendment, and (2) deprivation of a Fifth Amendment liberty interest under the stigma-plus doctrine based on stigmatizing dissemination without a name-clearing opportunity. The

8

Merit Systems Protection Board dismissed Plaintiff's appeal for lack of jurisdiction, and no CSRA mechanism afforded review. The CSRA provides no procedure for a name-clearing hearing and no forum to adjudicate retaliatory motive where MSPB jurisdiction is denied.

18. The Supreme Court has made clear that constitutional claims remain reviewable absent clear congressional intent to preclude such review. *Webster v. Doe*, 486 U.S. 592, 603 (1988). Political patronage and ideological retaliation claims arise directly under the First Amendment and are not displaced without express statutory preclusion. Nothing in the CSRA expressly bars review of colorable First Amendment retaliation claims or stigma-plus liberty claims involving dissemination to other agencies. To apply CSRA preclusion here would extinguish all judicial review; Plaintiff therefore properly invokes federal jurisdiction.

## Factual Background

### I.    The FBI's Internal Guidelines and Review Processes Are Designed to Maintain an Exceptional and Apolitical Workforce

19. Since 1908, the FBI has existed within the DOJ to protect the American people pursuant to the United States Constitution and laws.  The FBI

investigates and prevents criminal violations of federal law including terrorism, espionage, cybercrime, violent crime and public corruption.

20. FBI Special Agents are chosen through a highly selective process. By design, there is no political test for service in the agency. Instead, the FBI is required to hire, train, and promote talented and dedicated individuals without regard to political affiliation.

21. FBI Special Agents employees swear or affirm an oath of office before beginning their service to "support and defend the Constitution of the United States" and "bear true faith and allegiance to the same," and to "well and faithfully discharge the duties" of their office.

22. Plaintiff entered FBI New Agent Training at Quantico, Virginia in 2019.

23. Plaintiff was originally assigned to the Boston Field Office, but was transferred to the Atlanta Field Office for medical care for his oldest son, who was adopted from the foster care system weeks prior to Plaintiff entering training at Quantico.

24. Plaintiff had no conduct or performance issues, led between 15-20 operations to execute warrants, was selected to an FBI SWAT team, and aided the previous FBI Director's Executive Protection Detail during the first two years of his employment as a Special Agent.

10

25. Plaintiff completed his probationary period and was promoted from GL-10 to GS-11 *(see Exhibit C – Non-probationary & Exhibit D – SF-50, Box 10.)*.

26. Plaintiff's personnel file contains no sustained misconduct or performance findings.

27. Plaintiff's FBI Special Agent Supervisor described Plaintiff as the "prototype high-performer the FBI looks to recruit" At no time during plaintiff's career were concerns raised about his judgment, behavior, performance, or fitness for duty. Plaintiff never engaged in misconduct, violence, or unauthorized disclosure of classified information *(see Exhibit E – Supervisor Reference Letter)*.

28. FBI Deputy Director Paul Abbate, newly appointed in February 2021, said on a secure videoconference of field and headquarters leadership that he had heard employees question the FBI's investigative response to January 6. Deputy Director Abbate told the group of all senior FBI officials that anyone who questioned the FBI's response, or his decisions regarding it, did not belong in the FBI and should find a different job. Deputy Director Abbate also told the assembled leadership that if they

had an employee who did not agree with the FBI's response, they could have that employee call Abbate directly and he would "set them straight."

29. As one FBI employee wrote in an affidavit made public and provided to the DOJ OIG: "I have witnessed hundreds of Director [secure video teleconferences] and have never seen a direct threat like that any other time. It was chilling and personal, communicating clearly that there would be consequences for anyone that questioned his direction."

30. In August 2021, as a member of the FBI SWAT team, Plaintiff participated in execution of a January 6–related search warrant in Atlanta at the residence of Donnie Hyatt.

31. After the operation, an unrelated supervisor (P1) asked Plaintiff for his opinion of the operation.

32. Plaintiff stated that he questioned why substantial federal resources were used for that warrant when similar urgency was not consistently applied to other violations, such as crimes against children.

33. Plaintiff was not responsible for allocating resources or setting policy.

34. Plaintiff's statement was made in response to a spontaneous inquiry and based on his concern as a former foster parent.

35. Plaintiff's statement was not made pursuant to official duties.

12

36. The supervisor responded that Plaintiff and his "stupid f***ing SWAT buddies" should find another place to work if they disagreed.

37. Within approximately one month of Plaintiff's protected statements, FBI leadership launched an internal investigation premised on the transparently pretextual allegation that Plaintiff had "posed" as an FBI Special Agent — a charge that is facially absurd given that Plaintiff was an FBI Special Agent.

38. Plaintiff was interviewed once by the FBI's Internal Affairs Section. He fully cooperated and provided exculpatory evidence, including toll records that directly contradicted the allegation. At the conclusion of that interview, internal investigators candidly acknowledged to Plaintiff and his counsel that Plaintiff had clarified the situation and that they had been misled by FBI Headquarters as to what had actually occurred. Investigators represented that Plaintiff would receive a sworn statement for his review within three days.

39. No sworn statement was ever provided.

40. Internal investigators further disclosed to Plaintiff and his former counsel that the investigation had been personally directed by then-Executive Assistant Director Larissa Knapp — the same FBI official who had a

personal connection to the private citizen who had lodged the accusation against Plaintiff. That relationship was never disclosed, never recused, and never addressed.

41. The misconduct allegation was never adjudicated through the FBI's established disciplinary process. Instead, weeks later, Plaintiff was summarily terminated under the pretext of "failure to meet suitability standards" – a deliberately vague and standardless basis that permitted the Bureau to accomplish through administrative sleight of hand what it could not accomplish through legitimate process: the permanent silencing of an agent who told the truth when asked.

42. To legitimize their procedural irregularities, Plaintiff's personnel forms were backdated to fall within his probationary period and circumvent the Defendant's obligation to provide due process. The FBI approved the Plaintiff's termination on October 27, 2021 – then backdated the effective date to October 26, 2021 in an attempt to fall within the Plaintiff's probationary period.

43. The Defendants also terminated the Plaintiff from the GL-10 position. Whereas the Plaintiff had been previously promoted to the GS-11 position with tenure. Not only does the FBI explicitly state that Special

14

Agents will transition from the GL-10 to GS-11 grade upon completing their probationary period, the MSPB has considered any promotion within a probationary period a "constructive waiver" of any remaining probationary status.

44. Though plaintiff does not raise an employment dispute, the multiple irregularities and violations of FBI policy, all while the Plaintiff having successful performance and conduct, supports that the Defendants had a pretextual reason for terminating the plaintiff.

45. Plaintiff stated that deploying overwhelming law enforcement resources against a January 6th misdemeanor defendant — while simultaneously stripping those same resources from violent crimes against children investigations — represented a fundamental misallocation of FBI priorities. When the Bureau could not justify terminating Plaintiff for that truthful and protected assessment, it did what agencies do when retaliation masquerades as administration: it manufactured one. The pretextual grounds ultimately cited for Plaintiff's termination were fabricated after the fact, engineered to provide cover for a termination decision already made — one consistent with, and executed in furtherance of, Deputy Director Paul Abbate's directive to purge the

15

Bureau of agents whose perceived political beliefs conflicted with the priorities of the Biden Administration.

46. Four main executives were involved in the Plaintiff's termination:

   a. (Former) Assistant Special Agent (ASAC) in Charge Chris McRae

   b. (Former) SWAT Supervisory Special Agent Tommy Mayes

   c. (Former) ASAC Alexis Santiago

   d. (Former) SSA P1

47. After Plaintiff's termination, all four individuals involved in Plaintiff were awarded with positions at FBI Headquarters. According to Special Agents within the FBI, Tommy Mayes, who handled the paperwork for the Atlanta FBI SWAT team, was awarded the Supervisor position over the FBI Director's Executive Protection Detail.

## II. Stigmatizing Dissemination

48. In 2024, Plaintiff personally connected with two separate Homeland Security Investigation (HSI) Resident Agents in Charge (RAC) at the Gainesville (GA) and Dalton (GA) location. An HSI RAC is the leader of their specific field office location within HSI and is subordinate to the SAC.

16

49. Plaintiff connected with these two RACs through personal friendships he maintained at the Federal Law Enforcement Training Center (Glynco, GA) and through a SWAT operator who was married to the RAC in Gainesville (GA).

50. Plaintiff met in person with both RACs and had very productive, positive conversations. Both RACs said they had heard good things about the Plaintiff and would love to have him at their respective offices should a Direct-Hire Authorization (DHA) be opened by Congress.

51. In May 2024, Congress authorized DHA and the Plaintiff entered the hiring process for HSI. The Plaintiff progressed through the hiring process, which is typically extraordinarily expedited in DHA.

52. In or around August 2024, Plaintiff received a call from the HSI Special Agent in Charge (HSI SAC) of the Atlanta Field Office. The call was very productive and concluded in a positive, optimistic manner.

53. Approximately 10 minutes after the call concluded, the HSI SAC called Plaintiff back and asked specific questions regarding the Plaintiff's FBI internal investigation that were not known to the public. Immediately, the Plaintiff suspected that the HSI SAC had been in contact with someone at the FBI.

17

54. The HSI SAC randomly concluded the call by stating that FBI ASAC Chris McRae, the FBI Executive who orchestrated the Plaintiff's termination behind the scenes, was a "good guy."

55. HSI terminated all hiring discussions immediately thereafter.

56. A plausible inference shows the FBI produced stigmatizing information to HSI leadership who had expressed an interest in hiring the Plaintiff.

57. This plausibility is further strengthened by the letter sent to the Plaintiff on March 29, 2023 by former FBI Executive Assistant Director (EAD) of Human Resources, Jennifer Moore, that states:

*"[Souther] should also be aware that information regarding the circumstances and security concerns relating to your dismissal from the FBI may be made known to other federal government agencies[...]" (see Exhibit F - Dissemination Letter)*

58. In 2022, an MSPB Judge ordered the FBI to produce the Plaintiff's unredacted personnel file in its entirety.

59. No evidence within the Plaintiff's file suggests inappropriate conduct or abuse of power.

60. The derogatory narrative drafted by ASAC Chris McRae is an egregious manipulation of fact, unsupported by evidence, and contradicted by

evidence purposefully excluded by the FBI. McRae told the Plaintiff's former FBI colleagues that he was "sick" from the Plaintiff's termination but that "[FBI] Headquarters made him do it."

61. This defamatory, stigmatizing narrative is what the FBI threatened the Plaintiff with sharing to other Agencies and evidence suggests the FBI acted on the threats within EAD Moore's letter.

## COUNT I

### Violation of the First Amendment
### (Retaliation for Political Affiliation)

62. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1-61.

63. "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (*citing Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates."). *"The only exception is if "party affiliation is an*

*appropriate requirement for the effective performance of the public office involved." Branti,* 445 U.S. at 518.

64. A terminated federal employee may obtain reinstatement upon a showing that he or she was terminated on the basis of unlawful political patronage, i.e., because of the belief—even an incorrect belief—"that the employee had supported a particular political candidate" or otherwise "engaged in protected political activity." This prohibition extends to discharging employees on account of perceived partisan support or affiliation, regardless of whether that perception is correct. *See Heffernan v. City of Paterson,* 578 U.S. 266, 268 (2016). It is sufficient for the employee to show that he was terminated because he was "not affiliated with or sponsored by" the dominant political party or leaders. See *Branti,* 445 U.S. at 517 (quoting Elrod, 427 U.S. at 362).

65. Partisan affiliation and political support for a political party or particular presidential candidate were never legal or appropriate requirements for the effective performance of the plaintiff's role as an FBI Special Agent.

66. The reasons proffered by Defendants for Plaintiff's termination were pretextual on their face. The true cause is written in the timeline itself: within weeks of Plaintiff providing truthful, protected assessments

20

regarding waste, fraud, and abuse of FBI resources — assessments he was directly solicited to give by a Supervisory Special Agent — the Bureau manufactured an investigation, ignored exculpatory evidence, abandoned its own disciplinary process, and terminated him on a standardless, catch-all basis designed to evade scrutiny.

67. The initiation of that investigation, its irregular conduct, and the ultimate termination decision would not have occurred but for Defendants' perception that Plaintiff's honesty had branded him as an ideological dissident — an agent whose loyalty ran to the Constitution and the mission rather than to the political agenda then being imposed on the Bureau from above. Plaintiff was not terminated for misconduct. He was terminated for telling the truth when asked — and for refusing, even unknowingly, to subordinate his oath to the Bureau's enforced political orthodoxy. That is the precise harm the First and Fifth Amendments were designed to prevent, and it is the harm for which Defendants must now answer. By disguising their retaliatory motive as unsuitability to be an FBI Special Agent—without evidence, examination, or process—defendants chilled and punished plaintiff's protected political speech and expression.

21

68. While FBI Special Agents are excepted from the whistleblower and civil service protections of the Civil Service Reform Act, that statutory exclusion does not — and cannot — strip them of their constitutional rights. The First Amendment does not disappear at the FBI's door, and the courts have said so directly.

69. In McCabe v. Barr, 490 F. Supp. 3d 198 (D.D.C. 2020), the court held that a former FBI Deputy Director stated plausible First Amendment claims where he alleged his termination was driven by perceived political affiliation rather than the officially proffered grounds. The court recognized that statements from senior government officials suggesting termination was motivated by political loyalty — rather than legitimate misconduct — were sufficient to establish that the stated basis for termination was pretextual. Critically, the court further held that the accelerated timing of the termination decision, particularly where that acceleration appeared designed to satisfy political objectives rather than institutional ones, constituted cognizable evidence of improper motive. Discovery was ordered to uncover the communications and deliberative process behind the termination — precisely because courts understand

that politically motivated terminations are rarely documented on their face.

70. McCabe controls here. Like the plaintiff in that case, Plaintiff was a career FBI agent terminated on officially stated grounds that were pretextual on their face. Like McCabe, the timeline tells the story: the investigation was initiated, conducted irregularly, and resolved by termination — not through the Bureau's established disciplinary process, but on an accelerated track consistent with a decision already made for political reasons. And like McCabe, the communications, directives, and deliberative records of those who orchestrated Plaintiff's termination will confirm what the timeline already suggests: that this termination was about politics, not misconduct, and that the First Amendment prohibits exactly that.

71. Defendants' unconstitutional actions harmed Plaintiff by infringing upon the exercise of his constitutional rights, damaging his reputation, depriving him of his rightful status as an FBI employee in good standing with the agency, eliminating his only source of income and reducing his retirement benefits.

23

## COUNT II

## Violation of the Fifth Amendment
### (Due Process)

72. Plaintiff re-allege and incorporate by reference the allegations set forth in paragraphs 1-61.

73. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." Defendants unlawfully deprived Plaintiff of both property and liberty interests, without due process of law.

74. "[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). A government employee has a property interest where the government has "fostered rules and understandings" which entitle the employee 'to believe that he would lose his job only for'" specified reasons. *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979) (finding a protected property interest established by an FBI handbook provision). "To decide whether a government employee does or does not have a property interest in his job, protectable by due process, the court must look to the rules or understandings which define the terms of

24

employment." *Whalen v. City of Atlanta,* 539 F.Supp. 1202 (N.D. GA 1982) (citing *Ashton v. Civiletti,* 613 F.2d 923 (D.C.Cir.1980). "In other words, a due process analysis does not come into play until the court first finds the existence of a legitimate property or liberty interest." *Whalen, id.* 1205 (citing *Downing v. Williams,* 624 F.2d 612 (5th Cir. 1980)). "However, even one without job security cannot legitimately be dismissed for constitutionally impermissible reasons." *Whalen, id.* 1205, (citing *Ferguson v. Thomas,*) 430 F.2d 852 (5th Cir. 1970). *See also Painter v. Federal Bureau of Investigation,* 537 F.Supp. 232 (11th Cir. 1982). Plaintiff possessed a protected property interest in his employment derived from the FBI's historically consistent use of the FBI Ethics Policy Guide, and not from the application of an unlawful, politically driven litmus test.

75. Plaintiff reasonably understood that the FBI would abide by prohibitions on political coercion, retaliation, and dismissal for pretextual reasons.

76. FBI Special Agents possess a cognizable property interest in their continued employment, grounded in both statutory mandate and agency policy. Board of Regents v. Roth, 408 U.S. 564 (1972); Ashton v. Civiletti, 613 F.2d 923 (D.C. Cir. 1979). That interest carries with it a

corresponding constitutional protection: the Bureau may not weaponize adverse employment action as a mechanism to enforce political loyalty or punish ideological dissent.

77. The FBI's own governing policy confirms the boundaries of permissible conduct. The Bureau's Ethics Policy Guide expressly prohibits employees from using their "FBI title or position in any way to advance any particular partisan activity" and restricts political activity directed toward the success or failure of any political party, candidate, or partisan group. But these restrictions are not a one-way ratchet imposed solely on line agents. The same regulatory framework that constrains agent conduct equally constrains agency leadership. When that framework is selectively invoked — enforced against agents whose perceived political beliefs are deemed inconvenient, while senior officials engage in the very conduct the policy prohibits — it is no longer functioning as neutral workplace regulation. It has become an instrument of viewpoint discrimination, and the Constitution will not permit it to stand on those terms.

78. The statutory foundation reinforces this conclusion. 5 U.S.C. § 7321, expressly incorporated into the FBI's Ethics Policy Guide, reflects a deliberate congressional mandate that federal employees "should be

26

encouraged to exercise fully, freely, and without fear of penalty or reprisal" their right to participate — or refrain from participating — in the political life of the Nation. This is not aspirational language. It is a declared policy of Congress establishing the baseline expectation under which every federal employee serves and from which every legitimate employment action must be measured.

79. Taken together, these provisions satisfy Roth's requirement of a legitimate claim of entitlement. FBI Special Agents hold a reasonable, mutually explicit understanding — embedded in statute, regulation, and agency policy alike — that they will not face termination,  or other adverse action as a consequence of their political beliefs or as a means of compelling political conformity. That understanding constitutes a protected property interest, and any deprivation of it without constitutionally adequate procedural protections violates the Fifth Amendment's Due Process Clause.

80. Where, as here, the deprivation is itself the product of selective enforcement — where agents are targeted for conduct that agency leadership engages in with impunity, and where the stated grounds for termination are manufactured to conceal a politically motivated decision

made in advance — the constitutional violation is not merely procedural. It is structural. And it demands a remedy equal to its gravity.

81. In deviating from the FBI's well-established policies and procedures—by injecting a political motivation to terminate plaintiff's employment, defendants deprived plaintiffs of property without due process of law.

## COUNT III

### Violation of the Fifth Amendment
### (Stigma Plus Reputational Harm Due Process Violation)

82. Plaintiff re-allege and incorporate by reference the allegations set forth in paragraphs 1-61.

83. Defendants' conduct deprived plaintiff of a liberty interest without due process of law.    Government employees possess a "constitutionally protected liberty interest in professional reputation." *Board of Regents v. Roth*, 408 U.S. 564, 572-74 (1972).    Essentially, a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation "plus" the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause. *Paul v. Davis*, 424 U.S. 693 at 701–02, 96 S.Ct. at 1161; see also *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991). In order to establish that a deprivation of a

28

public employee's liberty interest has occurred without due process of law, the employee must prove that: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing. *Buxton v. City of Plant City*, 871 F.2d 1037, 1042–43 (11th Cir.1989); *Cannon v. City of Palm Beach*, 250 F.3d 1299, 1301.

84. Prior to Plaintiff's termination, then-Executive Assistant Director of Human Resources Jennifer Moore informed Plaintiff that the circumstances of his separation could be disclosed to other federal agencies. *(Exhibit F)*.

85. Following his termination, Homeland Security Investigations ("HSI") expressed direct-hire interest in Plaintiff.

86. Plaintiff met with the HSI RACs in both Gainesville and Dalton, Georgia. Both expressed genuine interest in hiring Plaintiff contingent upon the issuance of a Direct Hire Authorization.

87. In 2024, a Direct Hire Authorization was issued, and Plaintiff entered HSI's formal hiring process.

88. The HSI Special Agent in Charge ("SAC") for the Atlanta Field Office contacted Plaintiff directly to discuss potential employment. The conversation was substantive and concluding on decidedly positive terms.

89. Approximately ten minutes after that call ended, the HSI Atlanta SAC called Plaintiff again — this time referencing specific, non-public details drawn from Plaintiff's FBI internal investigation file, information that could only have originated from within the FBI.

90. Before ending that second call, the SAC remarked — without prompting or apparent context — that former FBI Assistant Special Agent in Charge Chris McRae, the official who orchestrated Plaintiff's termination at the direction of FBI Headquarters, was a "good guy."

91. Shortly thereafter, HSI terminated all hiring discussions with Plaintiff without explanation.

92. Defendant deprived plaintiff of that interest by making multiple false statements that impugned plaintiff's professional reputation and stigmatized him. These allegations establish a textbook stigma-plus claim under the Fifth Amendment's Due Process Clause. In Paul v. Davis, 424 U.S. 693 (1976), the Supreme Court held that reputational harm alone does not implicate a constitutionally protected liberty interest. But

where, as here, reputational damage is accompanied by a tangible, adverse alteration in the plaintiff's legal status or employment rights — the "plus" — a cognizable liberty interest is at stake, and the government must provide a name-clearing hearing before that interest is extinguished.

93. Plaintiff satisfies both prongs. The stigma is not speculative. FBI Headquarters disseminated non-public details from Plaintiff's internal investigation file to a prospective federal employer — HSI — in the course of an active hiring process that had advanced to direct SAC-level contact and was, by all indications, proceeding favorably. That disclosure was not incidental. It was purposeful. The timing, the specificity of the information referenced, and the SAC's unsolicited invocation of the very official who engineered Plaintiff's termination admit of no innocent explanation. The FBI reached into Plaintiff's post-termination employment prospects and poisoned them — using confidential investigative information as a weapon to ensure that an agent it had already silenced could not find refuge elsewhere in federal law enforcement.

94. The "plus" is equally clear. Plaintiff's termination on the basis of "failure to meet suitability standards" — a deliberately standardless and

stigmatizing designation — foreclosed not merely his FBI career but his ability to compete for comparable federal law enforcement employment. The subsequent HSI intervention confirms that the stigma attached to that designation is being actively enforced beyond the Bureau's walls. This is precisely the kind of government-imposed reputational harm combined with tangible employment foreclosure that Paul v. Davis and its progeny — including Siegert v. Gilley, 500 U.S. 226 (1991), and Doe v. Department of Justice, 753 F.2d 1092 (D.C. Cir. 1985) — recognize as a protected liberty interest requiring due process protections.

95. Plaintiff was never afforded a name-clearing hearing. He was never given the opportunity to confront the allegations used to justify his termination, to challenge the characterization embedded in his separation designation, or to rebut the information being disseminated to prospective employers on the government's behalf. That deprivation, standing alone, constitutes a violation of the Fifth Amendment's Due Process Clause. Combined with the evidence of active, coordinated interference in Plaintiff's post-termination federal employment opportunities, it reflects a continuing constitutional violation that this Court has both the authority and the obligation to remedy.

32

## COUNT IV

### Declaratory Judgment Act
### (28 U.S.C. §§ 2201 and 2202)

96. Plaintiff re-allege and incorporate by reference the allegations set forth in paragraphs 1-61.

97. Plaintiff is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiff and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants do not have authority to remove Plaintiff without affording him all rights and protections set forth by applicable statutes and regulations, the United States Constitution, and the First and Fifth Amendments thereto.

98. Plaintiffs is further entitled to declaratory relief to establish that his discharge was a legal nullity.

99. Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

33

## COUNT V

### Writ of Mandamus

100.   Plaintiff re-allege and incorporate by reference the allegations set forth in paragraphs 1-61.

101.   In the alternative, Plaintiff is entitled to a writ of mandamus commanding Defendants to return him to his former FBI employment in his former office and not remove him from federal service without following lawful procedures.  Defendants have a legal duty to reinstate Plaintiff and afford him the protections prescribed by law and, absent this Court granting relief, there is no other adequate means of redress.

102.   The provisions of 28 U.S.C. § 1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available means.  To the extent relief is unavailable under the Constitution, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

### JURY DEMAND

103.   Plaintiff demands a jury trial on all triable issues.

34

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

a. Issue a declaratory judgment that Defendants' actions violated Plaintiff's First Amendment rights and order appropriate relief;

b. Issue a declaratory judgment that Defendants' actions violated Plaintiff's Fifth Amendment due process rights and order appropriate relief, to include, but not limited to, a name-clearing hearing;

c. An order requiring Defendants to immediately reinstate Plaintiff and enjoin Defendants from taking any further adverse personnel action against him without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

d. Expunge Plaintiff's personnel files of all records related to Defendants' unconstitutional dismissal;

e. An award of backpay and other monetary and administrative relief as appropriate;

f. An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

g. Such other relief as the Court may deem just and proper.

35

Dated: February 23, 2026

Respectfully submitted,

Benjamin Odum Souther
Pro Se Plaintiff
5546 Bark Camp Rd, Murrayville, GA 30564 678-617-6386
ben.souther@yahoo.com

## Certificate of Service

Plaintiff mailed a copy of this document with sufficient postage to:

Attorney General Pam Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

FBI Director Kash Patel
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001