EXHIBIT A - OIG REPORT



**DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

## MANAGEMENT ADVISORY MEMORANDUM
## 26-009

**JANUARY 2026**

# Notification of Concerns Regarding the Federal Bureau of Investigation's Practices and Procedures Pertaining to Interviews in Certain Security Division Investigations

**OVERSIGHT AND REVIEW DIVISION**



**DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

January 14, 2026

Management Advisory Memorandum

To:        Kash Patel
           Director
           Federal Bureau of Investigation

From:      Don R. Berthiaume
           Acting Inspector General

Subject:   Notification of Concerns Regarding the Federal Bureau of Investigation's Practices and
           Procedures Pertaining to Interviews in Certain Security Division Investigations

---

The purpose of this memorandum is to inform you of the Department of Justice (DOJ) Office of the Inspector General's (OIG) concerns regarding the Federal Bureau of Investigation's (FBI) practices and procedures pertaining to interviews in certain Security Division (SecD) investigations of FBI employees holding security clearances that are prompted by alleged security concerns. We have found that in some investigations, SecD investigators asked or prepared vague and overly broad interview questions that, as worded, were not sufficiently tailored to address legitimate security concerns and unnecessarily intruded into potentially constitutionally protected activities.[1] The OIG identified these concerns in connection with a June 2024 complaint about interview questions that were asked in a SecD investigation of an FBI employee who had entered a restricted area near the U.S. Capitol on January 6, 2021, and whose security clearance was revoked.[2] For example, some witnesses were asked if this FBI employee had "[v]ocalize[d] support for President Trump."[3] In addition to interview questions about political expression, SecD investigators in other investigations asked or prepared questions about the political activities of FBI employees under investigation and other potentially constitutionally protected activities such as religious expression.

---

[1] The U.S. Supreme Court has recognized that individuals who become federal employees retain some rights under the First Amendment, including the freedom to express certain speech on matters of public concern as private citizens. See *United States* v. *Nat'l Treasury Employees Union*, 513 U.S. 454, 465-66 (1995) (citations omitted); *Pickering* v. *Bd. of Educ.*, 391 U.S. 563, 568 (1968) (acknowledging that the government has some power to restrict the speech of public employees).

[2] This Management Advisory Memorandum only addresses SecD investigations of FBI employees holding security clearances that are prompted by alleged security concerns, and it does not address the merits of any security clearance action that may have been taken in any SecD investigation of an employee holding a security clearance.

[3] Not all political expression and activity is permissible in the federal workplace. The Hatch Act generally prohibits federal employees from engaging in partisan political activity while on duty, in a federal facility, or using federal property. See 5 U.S.C. §§ 7323(a) and 7324(a). Political activity under the Hatch Act is defined as any activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group. 5 C.F.R. § 734.101.

We recognize that interview questions that touch upon constitutionally protected activity may sometimes be relevant to a determination of whether an FBI employee should maintain a security clearance. However, training, policy guidance, legal advice, and supervisory oversight are necessary to prevent inappropriate interview questions. The OIG identified significant deficiencies in SecD's practices and procedures that contributed to interview questions that unnecessarily intruded into employees' potentially constitutionally protected activities. Specifically, we found:

- A lack of training and guidance on the sensitivity in SecD investigations of intruding into employees' potentially constitutionally protected activities, particularly in investigations based on alleged security concerns under Guideline A (Allegiance to the United States) and Guideline E (Personal Conduct) of the National Security Adjudicative Guidelines (Adjudicative Guidelines);
- Inadequate supervision of SecD investigators' preparation for interviews; and
- Inadequate legal consultation regarding the propriety of potential interview questions.

In this memorandum, the OIG makes three recommendations to address the concerns we identified.[4]

## Relevant Authorities

The U.S. Supreme Court has recognized that "no one has a 'right' to a security clearance," characterizing the granting of a security clearance as "an affirmative act of discretion" by government officials.[5]

### Security Executive Agent Directive 4 and the National Security Adjudicative Guidelines

The Director of National Intelligence, who is the Security Executive Agent, issued Security Executive Agent Directive 4 (SEAD 4), which provides that initial and continued eligibility for access to classified information shall be "determined by appropriately trained adjudicative personnel" who evaluate "all information bearing on an individual's loyalty and allegiance to the United States, including any information relevant to strength of character, honesty, discretion, sound judgment, reliability, ability to protect classified or sensitive information, and trustworthiness."[6]

In SEAD 4, the Director of National Intelligence established and issued the Adjudicative Guidelines for all executive branch agencies to use when making determinations of initial and continued eligibility for access to classified information, including DOJ, which has delegated national security clearance determination

---

[4] The OIG has conducted prior work on issues relating to SecD security clearance actions, but such prior work was not related to interview questions asked during security clearance investigations. Specifically, the then DOJ Inspector General gave congressional testimony in September 2024 about SecD's revocation of the security clearance of a whistleblower. See Michael E. Horowitz, Inspector General, U.S. Department of Justice, before the Committee on the Judiciary, U.S. House of Representatives, concerning "Oversight of the Department of Justice's Handling of Security Clearances for Whistleblowers" (September 25, 2024), oig.justice.gov/news/testimony/statement-michael-e-horowitz-inspector-general-us-department-justice-committee; see also DOJ OIG, *Management Advisory Memorandum: Notification of Concerns Regarding the Department of Justice's Compliance with Whistleblower Protections for Employees with a Security Clearance*, Oversight and Review Division Report 24-067 (May 2024), https://oig.justice.gov/reports/notification-concerns-regarding-department-justices-compliance-whistleblower-protections.

[5] *Dep't of Navy* v. *Egan*, 484 U.S. 518, 529 (1988).

[6] Security Executive Agent Directive 4 (SEAD 4), National Security Adjudicative Guidelines (June 8, 2017), §§ E.1, E.4, available at https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf (accessed December 18, 2025).

authority to the FBI.[7] The Adjudicative Guidelines set forth 13 criteria, delineated as Guideline A through Guideline M, that security clearance adjudicators must evaluate when determining if an individual is an acceptable security risk for access to classified information.[8] Each guideline addresses a different area of concern that could pose a risk to national security, sets forth conditions that could raise the identified concern, and lists conditions that could mitigate the identified security concern.[9] The Adjudicative Guidelines describe the determination to be made as "an overall common sense judgment based upon careful consideration" of the 13 individual guidelines, "each of which is to be evaluated in the context of the whole person."[10]

We found there was a lack of training and guidance on the sensitivity in SecD investigations of intruding into employees' potentially constitutionally protected activities particularly in investigations based on alleged security concerns under Guideline A (Allegiance to the United States) and Guideline E (Personal Conduct).

**Guideline A (Allegiance to the United States) of the Adjudicative Guidelines**

Guideline A concerns an individual's allegiance to the United States, assessing whether an individual is loyal to the United States.[11] According to Guideline A, "there is no positive test for allegiance, but there are negative indicators," which include participation in or support for acts against the United States, placing the welfare or interests of another country above those of the United States, and failing to adhere to the laws of the United States where the violation of law is harmful to stated U.S. interests.[12] Guideline A provides that an individual who engages in acts against the United States or provides support or encouragement to those who do has already demonstrated a willingness to compromise national security.[13] The listed conditions that could raise a Guideline A security concern and "may be disqualifying" include "support of" any act of treason or sedition against the United States, "association or sympathy with persons who are attempting to commit, or who are committing" any act of treason or sedition against the United States, and "association or sympathy with persons or organizations that advocate, threaten, or use force or violence, or use any other

---

[7] SEAD 4, § E.1, Appendix A § 1.

[8] SEAD 4, Appendix A § 2.

[9] The criteria in the Adjudicative Guidelines are as follows: Guideline A (Allegiance to the United States); Guideline B (Foreign Influence); Guideline C (Foreign Preference); Guideline D (Sexual Behavior); Guideline E (Personal Conduct); Guideline F (Financial Considerations); Guideline G (Alcohol Consumption); Guideline H (Drug Involvement and Substance Misuse); Guideline I (Psychological Conditions); Guideline J (Criminal Conduct); Guideline K (Handling Protected Information); Guideline L (Outside Activities); and Guideline M (Use of Information Technology). SEAD 4, Appendix A.

[10] SEAD 4, Appendix A § 2(c). The Adjudicative Guidelines require adjudicators to use the "whole-person concept" when determining eligibility for access to classified information:

> The adjudicative process is an examination of a sufficient period and a careful weighing of a number of variables of an individual's life to make an affirmative determination that the individual is an acceptable security risk. This is known as the whole-person concept. All available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a national security eligibility determination.

SEAD 4, Appendix A § 2(a).

[11] SEAD 4, Appendix A § 3.

[12] SEAD 4, Appendix A § 3.

[13] SEAD 4, Appendix A § 3.

illegal or unconstitutional means, in an effort to...prevent Federal...personnel from performing their official duties."[14]

### Guideline E (Personal Conduct) of the Adjudicative Guidelines

Guideline E concerns personal conduct that involves "questionable judgment, lack of candor, dishonesty, or unwillingness to comply with rules and regulations" that "can raise questions about an individual's reliability, trustworthiness, and ability to protect classified or sensitive information."[15] Any "failure to cooperate or provide truthful and candid answers during national security investigative or adjudicative processes" is of "special interest."[16] Guideline E lists other conditions that could raise a security concern and "may be disqualifying," including "association with persons involved in criminal activity" and "credible adverse information" that "when combined with all available information, supports a whole-person assessment of questionable judgment, untrustworthiness, unreliability, lack of candor, unwillingness to comply with rules and regulations, or other characteristics indicating that the individual may not properly safeguard classified or sensitive information."[17] This provision of Guideline E specifically references "any disruptive, violent or other inappropriate behavior" and "a pattern of dishonesty or rule violations" among the conduct to be considered.[18]

### Federal Personnel Vetting Investigative Standards

The Federal Personnel Vetting Investigative Standards (FPVIS), which were jointly issued in May 2022 by the Security Executive Agent and the Director of the Office of Personnel Management (as the Suitability Executive Agent), established and aligned federal personnel vetting investigative standards for suitability, fitness, national security, and credentialing decisions by executive branch departments and agencies. The FPVIS provides investigative requirements for five personnel vetting scenarios, including the continuous vetting of federal employees who hold security clearances.[19] When applying the FPVIS, federal departments and agencies "must protect the privacy and civil liberties of all individuals to ensure consistent treatment, equity, and fairness in accordance with applicable laws."

### FBI Security Division Standard Operating Procedures

We did not find an FBI operations or policy guide applicable to SecD investigations of employees holding security clearances.[20] Instead, SecD issued and relied on Standard Operating Procedures (SOPs) applicable

---

[14] SEAD 4, Appendix A § 4.

[15] SEAD 4, Appendix A § 15.

[16] SEAD 4, Appendix A § 15.

[17] SEAD 4, Appendix A §§ 16(d), (g).

[18] SEAD 4, Appendix A §§ 16(d)(2), (d)(3).

[19] The FPVIS replaced the Federal Investigative Standards, which were issued by the Security and Suitability Executive Agents in 2012 and also contained investigative requirements for the continuous vetting of federal employees who hold security clearances.

[20] The FBI's Domestic Investigations and Operations Guide (DIOG) applies to the FBI's criminal, national security and foreign intelligence "investigative activities," but it does not apply to SecD investigations of employees holding security clearances. DIOG (February 27, 2024), §§ 1.1, 1.2, 2.9, available at https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2024-version/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29%202024%20Version%20Part%2001/view (accessed December 18, 2025).

4

to the units responsible for opening and conducting investigations of employees holding security clearances and adjudicating security clearances following such investigations.

According to the SOPs, an FBI Supervisory Special Agent (SSA) and other personnel are responsible for assessing and determining whether a referral of a security concern under the Adjudicative Guidelines warrants the opening of an investigation based on SecD's threat priorities. The SOPs instruct investigators to "conduct a logical investigation," including interviews, coordination with outside entities, and "[a]nalysis of other data sets." With respect to interviews, the SOPs provide no guidance to investigators other than noting that the "assigned SSA will oversee and assist [the investigator] as needed." These SOPs also do not provide any procedures or guidance regarding how investigators should approach and conduct interviews that may concern potentially constitutionally protected activities.

## The Issue

Following the June 2024 complaint, the OIG obtained the SecD investigation file for the FBI employee who had entered a restricted area near the U.S. Capitol on January 6, 2021. The file contained three separate outlines of prepared, typed interview questions that were used during SecD interviews of three witnesses who worked with the FBI employee. Each interview outline contained the following questions:

- "Vocalize support for President Trump?"
- "Vocalize objection to Covid-19 vaccination?"
- "Vocalize intent to attend 01/06/2021?"
- "Aware he attended the Richmond Lobby Day event on 01/18/2021?"[21]

In order to assess the frequency with which questions were asked about FBI employees' political beliefs, associations, and activities in SecD investigations of employees holding security clearances, the OIG requested and obtained: (1) the interview materials in several other specific SecD investigations that involved potentially constitutionally protected activities; and (2) a December 2024 report completed by the FBI Inspection Division (INSD) regarding its July 2024 strategic review of SecD's interview process in investigations of employees holding security clearances, which included a review of all such investigations conducted between January 1, 2021, and July 9, 2024. The INSD strategic review examined the investigative files for 1,216 SecD investigations and concluded that questions that "appeared to not pertain to the national security guidelines" may have been asked in 22 of the 1,216 investigations.

The INSD report and the interview materials in certain investigations revealed some interview questions that the OIG believes were not sufficiently tailored to address only security concerns under the Adjudicative Guidelines; but rather, as phrased, were vague and overly broad because such questions risked soliciting information concerning constitutionally protected expression, beliefs, associations, and other activities that was irrelevant to legitimate security considerations. The below examples are illustrative of questions from interview outlines or as documented in FD-302 interview reports that the OIG believes were not sufficiently tailored to address only security concerns.

- "Did you discuss your religion with co-workers?"
- "You previously mentioned you reconnected with the Catholic church in [year]. What brought that on? Life changes?"

---

[21] According to public source information, the Richmond Lobby Day Event is a public demonstration in support of Second Amendment rights.

- "Did you read Mein Kempf [sic]?"
- "[FBI employee under investigation] was asked if he attended any other rallies or demonstrations before or after 01/06/2021."

Interview questions that solicit information concerning potentially constitutionally protected expression, beliefs, associations, and other activities should be tailored to address security concerns under the Adjudicative Guidelines. For example, in an investigation where an FBI employee allegedly engaged in criminal conduct at a rally or demonstration, questions about that employee's attendance at other rallies or demonstrations where criminal conduct occurred would be relevant to the adjudication of the employee's security clearance under the Adjudicative Guidelines; however, a general question about that employee's attendance at rallies or demonstrations where no criminal conduct occurred may unnecessarily intrude into the employee's potentially constitutionally protected activities.

## Conclusions

As previously noted, we recognize that interview questions in SecD investigations that address constitutionally protected activity, including an individual's beliefs, motivations, affiliations, and associations, may be relevant to the adjudication of an FBI employee's security clearance based on the criteria set forth in the Adjudicative Guidelines. Specifically, Guideline A tasks executive branch agencies with determining if an individual has "association or sympathy" with persons or organizations that advocate, threaten, or use force or violence in an effort to overthrow the U.S. government.[22] Guideline E similarly requires an assessment of whether an individual has an "association with persons involved in criminal activity."[23]

Nonetheless, the concerning interview questions we identified posed a significant risk of soliciting information concerning constitutionally protected expression, beliefs, associations, and other activities that is irrelevant to the security concern at issue. We have not found evidence that such questions are routinely prepared for, or asked in, SecD investigations of employees holding security clearances.[24] In the limited number of investigations in which such questions were identified, it appears that many such investigations were prompted by alleged security concerns under Guideline A (Allegiance to the United States) or Guideline E (Personal Conduct). While the issue of concerning questions may not be widespread, it poses significant enterprise risk to DOJ and the FBI because of the potential impact on employees' and witnesses' perceptions of the criteria used to adjudicate security clearances, and, to the extent the public becomes aware of the issue, the potential effect on the general perception of the FBI's objectivity in conducting criminal and other investigations.

For these reasons, SecD supervisors and investigators should approach investigations that concern potentially constitutionally protected activities with the proper sensitivity, caution, and guidance. To avoid inappropriate interview questions, training, policy guidance, supervisory oversight, and legal advice are necessary. However, we found that SecD's SOPs provide no guidance to assist supervisors or investigators

---

[22] SEAD 4, Appendix A § 4(c)(1).

[23] SEAD 4, Appendix A § 16(g).

[24] For example, with respect to the potentially problematic questions regarding religious expression, "Did you discuss your religion with co-workers?" and "You previously mentioned you reconnected with the Catholic church in [year], What brought that on? Life changes?", INSD found these questions were prepared for use in only one investigation involving criminal and personal conduct allegations.

with identifying and navigating these complex issues, and legal consultation regarding interviews in such investigations is lacking.

## Recommendations

The OIG recommends that the FBI take the following actions to limit SecD's risk of unnecessarily intruding into potentially constitutionally protected activities, which can result from the use of vague and overly broad interview questions that are not properly tailored to solicit information relevant to a security concern under the Adjudicative Guidelines.

The FBI should:

1.  Provide specialized training to SecD supervisors and investigators that focuses on recognizing potentially constitutionally protected activity and includes guidance on conducting interviews without unnecessarily intruding into such activity.
2.  Establish clear protocols that require: (a) a heightened approval process for opening SecD investigations of employees with security clearances when these investigations are likely to concern potentially constitutionally protected activity; and (b) notifications within SecD leadership when such investigations are opened.
3.  Implement heightened supervision of SecD investigations of employees with security clearances when these investigations are likely to concern potentially constitutionally protected activity. Consultation with the FBI's Office of General Counsel regarding the propriety of interview questions in such investigations should be part of the heightened supervision process.

Recommendation Two limits notifications to within SecD leadership because, as the FBI's Security Programs Manager (SPM), the SecD Assistant Director holds DOJ's delegated authority to make determinations for eligibility to access classified information, and higher level FBI leadership does not have a role in such determinations.[25] DOJ Order 1701, Security Programs and Responsibilities, provides: "As the authority to make such determinations is delegated directly by the [DOJ Security Officer] to the SPM, no component official has the authority to dictate or overrule such SPM determinations. If consultation is necessary, SPMs may consult only with the [DOJ Security Officer] or designee with respect to such determinations."[26]

The FBI concurs with these recommendations. Please advise the OIG within 90 days of the date of this memorandum of the actions the FBI has taken or intends to take with regard to these recommendations. If you have any questions or would like to discuss the information in this memorandum, please contact me, or M. Sean O'Neill, Assistant Inspector General for the Oversight & Review Division, at (202) 514-9539.

cc:   William DelBagno
      Assistant Director
      Inspection Division
      Federal Bureau of Investigation

---

[25] DOJ Order 1701, Security Programs and Responsibilities (September 30, 2021, as revised February 22, 2022) (DOJ Order 1701).

[26] DOJ Order 1701, § II.D.15.

James McHenry
Acting Principal Associate Deputy Attorney General
Office of the Deputy Attorney General
Department of Justice